## HALL v. COMMONWEALTH.

Court of Appeals of Kentucky.
June 12, 1953.

58

H. R. Wilhoit and R. C. Littleton, Grayson, for appellant.

J. D. Buckman, Jr., Atty. Gen., John B. Browning, Asst. Atty. Gen., for appellee.

COMBS, Justice.

John William (Bill) Hall appeals from a sentence of life imprisonment for the murder of Alfred Lawhun. The victim was an itinerant one-armed farm hand, nearly 60 years old. He lived with Chester Hall, brother of the defendant Bill Hall, in the Smoky Valley section of Carter county. Bill, who is divorced from his wife, lived with his two children about one-half mile from the home of Chester on land owned by Elwood Stamper. Bill and Chester operated their farms as a joint enterprise and Lawhun had worked for both of them. Sometime prior to the death of Lawhun, Bill and another of his brothers, Eurastus by name (sometimes called just plain "Rastus"), and Rastus' son Bobby, a precocious young man of 13 who plays a prominent part in this drama, were in the "moonshining" business together. Bill sold his equity in this business to one Jimmy Lambert and Lambert sold to Lawhun. Lawhun appears to have been of a somewhat contentious nature and objected to some of the business methods of his partners. Sometime in January, 1951, he disappeared. The remains of his body were found during the latter part of the following April on the Driscoll farm, a mile or a mile and a half from Chester Hall's home. Examination of the body disclosed he had been killed by a shot through the back of his head.

Shortly after the discovery of Lawhun's body, Bobby Hall was arrested and placed in jail. He admitted he had killed Lawhun. Bobby's first version of the killing,

later repudiated, was that he had killed Lawhun on his own responsibility and without assistance. He said that soon after Lawhun bought Jimmy Lambert's interest in the "moonshining" business he, Bobby, stole 12 gallons of the liquor they had made and sold it. Lawhun accused him of the theft, to which he finally admitted. He told Lawhun he had the liquor hidden on the Driscoll farm and had not disposed of it. Lawhun kept insisting with increasing heat that he retrieve the whisky and surrender it to him. Bobby kept putting him off but finally, on the morning of the tragedy, consented to take Lawhun to the place where the whisky was cached.

Before leaving the Chester Hall home with Lawhun, Bobby said he armed himself with a weapon he had fashioned from a .22 rifle by sawing off the barrel and making adjustments on the stock so that it could more easily be carried on his person. When they reached the Driscoll farm where the liquor was supposed to be hidden, Bobby pretended to make a search for it. After a time Lawhun's patience was exhausted and he said: "You little son of a b...., I am going to kill you if you don't get that whisky" and knocked him down. Whereupon Bobby drew his weapon and killed Lawhun.

Continuing the story, Bobby said he then took $41 in bills from the bib pocket of Lawhun's overalls and went to Wedge McGlone's home to find his uncle Bill, the defendant here. Upon arriving at McGlone's house, he was informed that Bill had left for Mansfield, Ohio, but he overtook Bill a short distance up the road at the Bethel church. He told Bill he had killed Lawhun and gave him one of the $20 bills he had taken from his body. Bill advised him to dispose of the gun and the body and then proceeded on his way toward Olive Hill where he was to board a bus for Mansfield, Ohio.

After Bobby had been in jail for about a month awaiting indictment and trial, he repudiated his first confession and related another story which is the version of the tragedy now relied on by the Commonwealth.

According to Bobby's last version, to which he testified in this case, Lawhun was not killed on the day Bill Hall left for Mansfield but was killed the day before, and Bill did the killing. Bobby's last story was, in substance, that early in the morning, about daylight, on the day before Bill Hall left for Mansfield, he came to the home of Chester Hall, where Bobby and Lawhun had spent the night. Bobby came out of the house and discovered his uncle Bill. Bill told him to "get a gun for him to kill Alfred Lawhun with, and said he would kill me if I didn't." Bobby got the sawed-off .22 from underneath an outbuilding where he had previously hidden it and gave it to Bill, who slipped it up his sleeve. Bobby then went in the house and told Lawhun he would go with him to retrieve the hidden whisky provided his uncle Bill could go with them. Lawhun agreed for Bill to go along and the three of them walked out the ridge about one and one-half miles toward the Driscoll place. Bill "dropped the gun out of his sleeve and said, 'watch me kill the son of a b.....'" He shot Lawhun and then beat him over the head with the weapon until he looked like he was dead. Bill then took the $41 Lawhun had in the bib of his overalls. He gave Bobby $21 of it and told him to spend the dollar but not to let anyone know he had the $20. Bobby then went back to Chester Hall's place and Bill went "out the ridge." Bobby saw Bill again the next day at the Bethel Church. Bill was on his way to Mansfield and gave Bobby instructions about disposing of the body and the murder weapon. The next time Bobby saw Bill was about three weeks later when he returned from Mansfield on a visit. On that occasion Bobby and Bill returned to the scene of the crime, saw the body, and Bill again gave Bobby instructions as to how he should dispose of the body.

In addition to the testimony of Bobby Hall, the Commonwealth introduced at least three witnesses who testified that Bill had threatened to kill Lawhun. Another witness testified that a few weeks before the killing Bill had drawn a pistol on Lawhun in an argument over a poker game. Mr. & Mrs. Elwood Stamper, with whom Bill visited, and perhaps boarded, in Mansfield, testified that shortly after Bill came to Mansfield he told them he had killed Lawhun.

The defense was, in effect, based on an alibi. It was established without contradiction that Bill Hall left Carter county for Mansfield on Thursday morning, January 11, 1951. Since Bobby testified Lawhun was killed on the morning previous to the day his uncle Bill left for Mansfield, this fixed the time of the killing, according to Bobby, on the morning of January 10. Bill proved by a number of witnesses that he was not at or near the scene of the killing at the time Bobby says Lawhun was killed. Using this as a premise, it is argued for the defendant that the verdict is flagrantly against the evidence. Admittedly there is some confusion as to the dates but, considering the evidence in its entirety, we are of the opinion it is sufficient to sustain the verdict. Although the testimony of Bobby Hall, standing alone, is far from convincing, there were other facts and circumstances available to the jury by which Bobby's testimony could be tested. Among these facts are the defendant's previous threats and his admission of guilt to the Stampers. Moreover, the defendant's testimony concerning his activities on his return from Mansfield some three weeks after the killing is evasive and contradictory. His interest during that visit in disposing of the murder weapon was more than casual and more than ordinarily would have been expected of him in merely trying to protect his nephew Bobby.

The defendant also contends that the "accomplice" instruction given by the court was erroneous. The instruction in question reads: "An accomplice within the meaning of the law is one of several persons equally concerned in the commission of a crime either as a principal or one who aids and abets in the commission of the crime. The witness Bobby Hall, in the meaning of the law, is an accomplice, and the jury shall not convict upon the testimony of Bobby Hall alone, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not suffi-

cient if it merely shows that the offense was committed and the circumstances thereof." The defendant's argument is directed to the statement in the instruction that "The witness Bobby Hall, in the meaning of the law, is an accomplice." It is said that when the court told the jury that Bobby was an accomplice, this was, in effect, saying that someone else was the principal when, according to the defendant's theory, Bobby himself was the principal. We fail to see how the jury could have been misled by the instruction. It is noted that the court defined an accomplice as a "principal or one who aids and abets in the commission of the crime." According to Bobby's testimony, he was at least an aider and abetter, in the crime. According to defendant's theory he was a principal. In either event, under the court's definition, which is substantially the same as that shown in Ballentine's Law Dictionary, Bobby was an accomplice. This being so, the court did not err in referring to him as such. See Horn v. Commonwealth, Ky., 251 S.W.2d 864.

It is also argued that the judgment should be reversed because the court was not legally in session when the defendant was tried. This argument has reference to a 1952 amendment to the statute fixing the terms of court in Carter county. KRS 23.050(37). Prior to the amendment, the statute authorized six terms of court in the county, one of which was to commence on the fourth Monday in August. The 1952 amendment provides for three terms of court in the county, commencing on the first Monday in March, the first Monday in June, and the second Monday in November, thereby completely eliminating the old terms. Section 2 of the amendment made it effective as of September 1, 1952.

The fourth Monday in August, 1952, fell on August 25 and the Carter circuit court was convened under the old statute on that day. This case was called for trial on September 2 and the trial was concluded on September 4. The defendant objected to being tried on the theory that the 1952 amendment eliminated the August term of court and so the court was not legally in session after September 1, the

effective date of the amendment. It seems to us this argument is more ingenious than logical. As we view the matter, the amendment has no application to the August term of court which was regularly convened under the statute then in force. The amendment was intended to apply to terms of court commencing after September 1, 1952. This seems to be the reasonable interpretation of the statute, especially in view of the fact the August term did not conflict with any term of court required to be held after the effective date of the amendment.

Finding no errors in the record prejudicial to the defendant's substantial rights, the judgment is affirmed.